# United States Court of Appeals
## For the First Circuit

No. 24-1390

DAVID DAOUD WRIGHT,

Plaintiff, Appellant,

v.

DANIEL W. MARTIN, Warden, Wyatt Detention Facility,

Defendant, Appellee,

JOHN DOE 1-3,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Montecalvo, Lipez, and Aframe, Circuit Judges.

Amato A. DeLuca, with whom DeLuca, Weizenbaum, Barry & Revens, Ltd. was on brief, for appellant.

Aaron L. Weisman, with whom Pannone Lopes Devereaux & O'Gara LLC was on brief, for appellee.

October 29, 2025

**LIPEZ**, **Circuit Judge**.  Appellant David Daoud Wright alleges that, while confined at the Donald W. Wyatt Detention Facility ("Wyatt") in Central Falls, Rhode Island, awaiting resentencing on federal charges, he suffered violations of his rights under the First and Fourteenth Amendments.  Seeking financial redress, he filed a complaint pro se in the District of Rhode Island against Daniel Martin, Wyatt's then-warden, and three unknown Wyatt officials pursuant to 42 U.S.C. § 1983.  The defendants filed a motion to dismiss Wright's complaint, which the district court granted in a text order, citing a prior district court decision that held Wyatt officials act under color of federal law -- not state law -- and thus are not subject to suit under § 1983.  Because we conclude that Wright's complaint plausibly alleges action under color of state law, we reverse.

I.

## A. Facts and Procedural History

We draw this brief factual recitation "from the complaint, taking the well-pleaded facts as true and construing all reasonable inferences in [Wright's] favor." Zhou v. Desktop Metal, Inc., 120 F.4th 278, 283 (1st Cir. 2024).  Wright was detained at Wyatt from January 2020 to June 2021 pending resentencing on federal criminal charges.  During his approximately seventeen-month period of confinement at Wyatt, Wright -- a practitioner of Sunni Islam -- communicated with Martin

and various other officials regarding his faith, including his desire to hold "religious services" and obtain "religious program[ming] and religious property." In response, the Wyatt officials told Wright "that his religious adherence was problematic" and subjected him to "harassment" and "insults." Martin also denied Wright permission to host congregational prayer in the Wyatt chapel, despite Wright explaining the importance of such prayer to his Islamic faith, and even though congregational prayer was prohibited in all other areas of the facility. Eventually, Martin facilitated Wright's transfer out of Wyatt, which Wright contends was to "teach him a lesson for complaining too much."

Proceeding pro se, Wright filed a complaint against Martin and three unknown Wyatt officials under 42 U.S.C. § 1983, seeking damages for the defendants' alleged retaliatory acts and infringement upon Wright's free exercise of religion in violation of the First and Fourteenth Amendments. The defendants moved to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that they did not act under color of state law and thus were not subject to suit under § 1983. In a text order, the district court granted the defendants' motion to dismiss, explaining that "[f]or the reasons set forth in Glennie v. Garland, C.A. No. 21-231[], 2023

WL 2265247 (D.R.I. Feb. 28, 2023), Mr. Wright has failed to set forth a justiciable [§] 1983 claim."  This appeal followed.

## B. Background on the Facility[1]

In 1991, the Rhode Island General Assembly enacted the Municipal Detention Facility Corporations Act (the "Act"), which permitted each municipality within the state to establish a municipal detention facility corporation with the power to erect and operate a detention facility.  See R.I. Gen. Laws §§ 45-54-1 to -2 (1991).  The Act's purpose was twofold: "to meet the need for economic development" within Rhode Island and to "address the detention facility needs of the United States."  Id. § 45-54-2(b); see also City of Central Falls v. Cent. Falls Det. Facility Corp., No. 94-3939, 1997 WL 839936, at *3 (R.I. Super. Ct. June 23, 1997).  Pursuant to the Act, the City of Central Falls created the Central Falls Detention Facility Corporation (the "CFDFC") to develop a pretrial detention facility, which became Wyatt.  See Central Falls, 1997 WL 839936, at *1.  The CFDFC is the only corporation, and Wyatt the only detention facility, created under the Act.  See id.

---

[1] We take this background on Wyatt from the public record, including prior state and district court decisions.  See Giragosian v. Ryan, 547 F.3d 59, 66 (1st Cir. 2008) ("A court may consider matters of public record in resolving a Rule 12(b)(6) motion to dismiss.").

- 4 -

Per the Act, the CFDFC "is a public corporation" that "is an instrumentality and agency of [Central Falls], but has a distinct legal existence from" it. R.I. Gen. Laws § 45-54-1(a). The CFDFC is governed by a five-member board of directors appointed by the mayor of Central Falls and approved by the city council. See id. § 45-54-5(a); see also LaCedra v. Donald W. Wyatt Det. Facility, 334 F. Supp. 2d 114, 121 (D.R.I. 2004). Among the CFDFC's more than two dozen enumerated "[p]owers" is the power to enter into all agreements "necessary or incidental to the performance of [the CFDFC's] duties and the execution of its powers," R.I. Gen. Laws § 45-54-6(14); "[t]o provide for the care, custody, control and transportation of all detainees or inmates committed to detention or incarceration at" Wyatt, id. § 45-54-6(20); to hire, retain, discipline, and discharge "employees for the operation of" Wyatt, id. § 45-54-6(22); and "[t]o make and promulgate necessary rules and regulations" regarding, among other things, "religious services . . . for all persons detained at" Wyatt, id. § 45-54-6(26). The CFDFC also may "delegate any or all" of its powers under the Act "to its duly designated agents . . . or employees at its discretion." Id. § 45-54-6(27).

After initial struggles to secure funding, the CFDFC entered into an agreement with the Rhode Island Port Authority and

Economic Development Corporation,[2] which offered to finance Wyatt's construction by issuing revenue bonds. See Central Falls, 1997 WL 839936, at *1. The CFDFC agreed to pay the bonds "through per diem charges collected from the housing of prisoners." Id. Around this time, the CFDFC also "contracted with the U.S. Marshals Service to house federal pretrial detainees at Wyatt," Sarro v. Cornell Corr., Inc., 248 F. Supp. 2d 52, 55 (D.R.I. 2003), the revenue from which would allow the CFDFC to cover its debt payments, see Central Falls, 1997 WL 839936, at *1.

Shortly before the facility was scheduled to open, however, the Marshals Service informed the CFDFC that it would be sending far fewer detainees than initially promised. See id. To satisfy "its financial obligations" and generate "revenue for the State of Rhode Island and the City of Central Falls," the CFDFC contracted with North Carolina to house individuals at Wyatt incarcerated by that state. Id. At some point, the CFDFC also entered into a contract to house individuals incarcerated by Massachusetts authorities. See id. at *5. Indeed, for a period, around twenty percent of the individuals at Wyatt were state detainees. See id. at *1, *5. In subsequent years, the CFDFC apparently has also entered into agreements to house individuals at Wyatt in the custody of the Federal Bureau of Prisons, U.S.

_____

[2] This entity is now known as the Rhode Island Commerce Corporation. See R.I. Gen. Laws § 42-64-1.1 (2014).

- 6 -

Immigration and Customs Enforcement, the U.S. Navy, and the Mashantucket Pequot Tribe.  See About the Facility, Donald W. Wyatt Detention Facility, https://perma.cc/GR8X-E564.  However, the complaint does not allege, nor does the public record reveal, the historical or current breakdown of state, federal, and tribal detainees at Wyatt.

## II.

"We review de novo a district court's allowance of a motion to dismiss for failure to state a claim under Rule 12(b)(6)."  Rivera v. Kress Stores of P.R., Inc., 30 F.4th 98, 102 (1st Cir. 2022).  To survive a motion to dismiss, the "complaint need not set forth detailed factual allegations, but it must contain sufficient factual matter to state a claim to relief that is plausible on its face."  In re Curran, 855 F.3d 19, 25 (1st Cir. 2017) (citation modified).

Section 1983 provides a federal cause of action against a "person" acting "under color of" state law who deprives another of "any rights, privileges, or immunities secured by the Constitution" or federal laws.  42 U.S.C. § 1983.  A defendant acts "under color of state law" by "exercis[ing] power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  Boniface v. Viliena, 145 F.4th 98, 116 (1st Cir. 2025) (quoting West v. Atkins, 487 U.S. 42, 49 (1988)); see also Belbachir v. County of McHenry, 726

F.3d 975, 978 (7th Cir. 2013) (observing that § 1983 "imposes tort liability on state and local employees . . . for violating federal rights").

## A. Nature of the Facility

Martin argues that he cannot be liable under § 1983 because at the time of the alleged constitutional violations, he was acting under color of federal law rather than state law. See Rogers v. Vicuna, 264 F.3d 1, 4 (1st Cir. 2001) ("[Section] 1983 cannot form the basis of an action against individuals acting under color of federal law."). In support, Martin relies primarily on the District of Rhode Island's holding in Glennie, upon which the district court based its dismissal of Wright's complaint. That case involved a suit against various Wyatt officials under, inter alia, § 1983, brought by an individual detained at Wyatt while awaiting adjudication on federal charges. Glennie, 2023 WL 2265247, at *1. In deciding whether the defendant officials were amenable to suit under § 1983 for their alleged constitutional violations, the Glennie court evaluated prior decisions from the District of Rhode Island that had reached inconsistent conclusions on that issue. See id. at *15; compare Sarro, 248 F. Supp. 2d at 61, 64 (holding that Wyatt employees act under color of federal law), with LaCedra, 334 F. Supp. 2d at 140-41 (holding that Wyatt employees act under color of state law).

Notably, at the time that both Sarro and LaCedra were decided, the CFDFC had contracted with a private corporation, Cornell Corrections, Inc., "to operate the facility and employ [its] staff." Sarro, 248 F. Supp. 2d at 55 ("Under the terms of that contract, Cornell [Corrections] has the exclusive use of the facility and the exclusive authority to operate it."); see also LaCedra, 334 F. Supp. 2d at 121. Thus, given that Wyatt was a "privately[]operated facility" and the defendant officials were "private prison guards," the Sarro and LaCedra courts looked to the various tests "for determining whether a private party acts under color of state law." Sarro, 248 F. Supp. 2d at 54, 59-61; see also LaCedra, 334 F. Supp. 2d at 139-42. The Glennie court likewise understood Wyatt to be "privately operated," Glennie, 2023 WL 2265247, at *14 n.21 (citation modified), so it also applied those tests, ultimately concluding that "Wyatt's 'private prison guards [are] federal actors,'" id. at *16 (quoting Sarro, 248 F. Supp. 2d at 61).

Relying on the information available to him at the motion-to-dismiss stage -- the explanation of Wyatt's creation and early years provided in Sarro, LaCedra, and Central Falls -- Wright assumes on appeal that Wyatt is currently operated by a "private contractor[,] Cornell Corrections." In light of that assumption, he urges us to follow LaCedra and hold that Martin acted under color of state law because Martin's private employer, Cornell

Corrections, can "trace [its] traditional public function of prison operations" to the State of Rhode Island. LaCedra, 334 F. Supp. 2d at 140-41. However, at oral argument, counsel for Martin appropriately corrected Wright's mistaken assumption, explaining that Cornell Corrections is not, in fact, Martin's employer because the CFDFC cut ties with that company in 2007.[3] Rather, counsel clarified that the CFDFC has itself been operating Wyatt for many years and that Wyatt's officials are employed directly by the CFDFC. At this stage, we will accept the truth of counsel's representations and thus assume -- favorably to Wright, as we shall explain -- that Wyatt is currently owned and operated, and Wyatt's officials are employed, by the CFDFC.[4] See Zhou, 120 F.4th at 283.

Proceeding under such an assumption, which does not conflict with the allegations in Wright's complaint, leads to a different analysis than that undertaken by the courts in Sarro,

---

[3] Counsel's representations are consistent with publicly available information. See Follow-up Report on Wyatt Detention Facility Ri July 2011, Prison Legal News, https://perma.cc/UU92-74AW.

[4] Our approach reflects that information about Wyatt's operation and Martin's employment is more readily available to Martin than to Wright. See Menard v. CSX Transp., Inc., 698 F.3d 40, 45 (1st Cir. 2012) (explaining that "'some latitude' may be appropriate" when deciding a motion to dismiss "where, as here, 'some of the information needed may be in the control of [the] defendants'" (alteration in original) (quoting Pruell v. Caritas Christi, 678 F.3d 10, 15 (1st Cir. 2012))).

LaCedra, and Glennie, where, as noted above, the pertinent question was "whether a private party acts under color of state [or federal] law." Sarro, 248 F. Supp. 2d at 59. Here, we are accepting that Martin is an employee of "a public corporation" that -- under a Rhode Island statute -- is an "agency" of the City of Central Falls and is governed by board members appointed by the city's mayor and approved by its city council. R.I. Gen. Laws §§ 45-54-1(a), -5(a). In other words, the CFDFC appears simply to be an extension of the City of Central Falls itself. See Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 397 (1995) (holding "[t]hat [g]overnment-created and -controlled corporations are (for many purposes at least) part of the [g]overnment itself" because "[i]t surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form"); cf. R.I. Gen. Laws § 45-54-3(15) (defining "State" as including "any . . . public corporation, agency, or instrumentality of the state"). Accordingly, in assessing the adequacy of Wright's complaint, we view the facility as municipally owned and operated and Martin as a municipal employee.

Despite the municipal governance, Martin insists that Wyatt is a federal facility because the purpose of the statute under which the CFDFC was created was to enable the confinement of "federal, not State of Rhode Island, detainees." (Emphasis

- 11 -

omitted.) Even if our inquiry would differ for a facility whose sole purpose was to house federal detainees, "address[ing] the detention facility needs of the United States" was only one of the Act's stated purposes, as we noted above. See R.I. Gen. Laws § 45-54-2(b). Through the Act, the Rhode Island General Assembly also "declared that a need for economic development projects exists within" Rhode Island and that "the development of" Wyatt "would help to meet" that "economic" need, thus "further[ing] the public policy of the [S]tate." Id. § 45-54-2(b)-(c). At the facility's inception, when housing nonfederal detainees became economically advantageous, the CFDFC contracted to do so. See Central Falls, 1997 WL 839936, at *1. In other words, it appears that Rhode Island saw a "widely reported" need of the United States and determined that meeting the federal need would advance the State's own interests. See R.I. Gen. Laws § 45-54-2. When the demand for a federal detention facility was less substantial than anticipated, the CFDFC served the State's interest by agreeing to house state detainees, and nothing in the statute precluded it from doing so. See Central Falls, 1997 WL 839936, at *8 (concluding that the CFDFC "is not required exclusively to house federal inmates in its facility"). We therefore do not see how the Act's purpose supports Martin's contention that Wyatt is a federal facility notwithstanding its decidedly municipal attributes.

- 12 -

**B. Impact of the Federal Contract**

Martin also asserts that, even accepting that Wyatt is a municipal facility, Wright has not stated a claim because "Wright was at all relevant times a <u>federal</u> detainee" held at Wyatt pursuant to the CFDFC's contract with the U.S. Marshals Service. We have not previously addressed whether a contract with a federal agency to house federal detainees converts a state- or municipal-owned and operated facility into a federal one. As the Seventh Circuit has noted, however, "[c]ases similar to this, allowing [§] 1983 claims by federal prisoners against county or city employees, are legion." <u>Belbachir</u>, 726 F.3d at 978 (collecting cases).

<u>Belbachir</u>, for example, involved a suit by the estate of a noncitizen who died while confined in a county jail, where she was placed pursuant to a contract between the county and federal immigration authorities. <u>Id.</u> at 977-78. Explaining that "the contract did not federalize" the county jail, "which continued to house nonfederal as well as federal prisoners," the Seventh Circuit held that the noncitizen's estate "rightly base[d] [its] federal claims on" § 1983. <u>Id.</u> at 978; <u>cf.</u> <u>Logue</u> v. <u>United States</u>, 412 U.S. 521, 529-30 (1973) (declining, in context of claim under Federal Tort Claims Act, to characterize as federal employees county jailers who were overseeing federal prisoners pursuant to contract with federal agency).

Similarly, in Henderson v. Thrower, the Fifth Circuit permitted "a federal prisoner" who "was temporarily placed in the Mobile, Alabama city jail" pursuant to a contract between the city and the Federal Bureau of Prisons to proceed against various jail officials under § 1983. 497 F.2d 125, 125-26 (5th Cir. 1974) (per curiam). The court explained that the contract between the city and the federal government, while allowing the federal government to inspect the facility, did not "authorize federal interference with the operation of the" city jail. Id. at 126. Because the defendant officials "supervised and treated all" individuals in the jail "by virtue of the positions conferred on them by the city, a creature of the State of Alabama," the officials could not "escape liability under § 1983 on the basis of [the] plaintiff's peculiar status." Id.; see also, e.g., E. D. v. Sharkey, 928 F.3d 299, 303-04 (3d Cir. 2019) (allowing § 1983 suit brought by federal immigration detainee confined at county facility pursuant to contract with federal agency); Porro v. Barnes, 624 F.3d 1322, 1324-25 (10th Cir. 2010) (similar); Loe v. Armistead, 582 F.2d 1291, 1293 (4th Cir. 1978) (similar).

We agree with our sister circuits that the mere fact of a contract to house federal detainees does not transform a municipally owned and operated facility into a federal one, or a municipal employee into a federal actor. Importantly, Wright's complaint does not allege that the contract somehow deputized

Wyatt's employees as federal agents or "federalize[d]" Wyatt, which, as noted above, has historically "house[d] nonfederal as well as federal" detainees. Belbachir, 726 F.3d at 978; see also Li v. City of Santa Ana, No. 8:20-cv-00068, 2021 WL 3207957, at *4-5, *5 n.3 (C.D. Cal. May 25, 2021) (rejecting defendants' argument that, upon entering contract with U.S. Marshals Service, county jail became "completely 'federalized'" because plaintiffs "have produced evidence that the [j]ail still houses state and local detainees"); Green v. Scarbrough, No. 7:20-CV-00123, 2021 WL 11732421, at *2 (M.D. Ga. Apr. 19, 2021) (similar), R. & R. adopted, No. 7:20-CV-123, 2021 WL 11732694 (M.D. Ga. Sep. 2, 2021). Nor does the complaint allege that, under the contract, the U.S. Marshals Service assumed responsibility for the day-to-day treatment of persons housed at Wyatt or the promulgation of rules and regulations affecting that treatment -- including rules pertaining to religious services -- which, by statute, rests with the CFDFC unless otherwise delegated. See R.I. Gen. Laws §§ 45-54-6(20), (26)-(27); see also, e.g., Henderson, 497 F.2d at 126; Jarno v. Lewis, 256 F. Supp. 2d 499, 503 (E.D. Va. 2003). Accordingly, and in light of Martin's counsel's representations, Wright has adequately pleaded that Martin's allegedly unconstitutional conduct occurred under color of state law.

The cases that Martin cites in arguing otherwise -- in addition to Glennie -- invariably involve suits against private

prison employees at privately operated facilities. See, e.g., Spikes v. Car Toys, Inc., No. 21-CV-00681, 2024 WL 4135234, at *1 (D. Colo. Sep. 10, 2024) (suit against "a private company that operates a detention facility . . . that houses federal detainees and prisoners pursuant to a contract with the United States Marshals Service"); Rocha-Jamarillo v. Madrigal, 727 F. Supp. 3d 1370, 1388 (M.D. Ga. 2024) (suit against "private detention center entities" holding detainees "on behalf of the federal government"). Those cases are inapt, however, given that, for the reasons we have explained, no private conduct is at issue here. Cf. Doe v. United States, 831 F.3d 309, 314-16 (5th Cir. 2016) (applying tests for determining "whether private conduct is fairly attributable to the State" and distinguishing Henderson on the ground that, in that case, "the jail was county owned and operated; it unequivocally derived its existence from the state. No private contractor was involved." (citation modified)).

\*\*\*

In sum, because Wright has plausibly pleaded that Martin acted under color of state law in allegedly infringing upon Wright's constitutional rights, we reverse the decision of the district court and remand for further proceedings consistent with this opinion.

So ordered.